**SIGNED this 15 day of February, 2008.**

_____
R. Thomas Stinnett
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 07-12971 |
| | Chapter 13 |
| John Daniel Gray | |
| Deana Michelle Gray, | |
| Debtors. | |

**MEMORANDUM**

Appearances:

      Victoria A. Ferraro, Williams & Prochaska, P.C., Nashville, Tennessee, for General Motors Acceptance Corporation, LLC

      Mark T. Young, Mark T. Young & Associates, Hixson, Tennessee, for the Debtors

R. Thomas Stinnett, United States Bankruptcy Judge

      General Motors Acceptance Corporation, GMAC, objected to confirmation of the debtors' proposed chapter 13 plan. The court conditionally confirmed the plan and set a *de novo* hearing on GMAC's objection. GMAC and the debtors subsequently waived oral argument and agreed that the court

could decide the objection on the basis of stipulations and briefs. The issue is whether GMAC's security interest in a 2005 Saturn automobile is wholly, partly, or not-at-all a purchase money security interest.

The debtors, Mr. and Mrs. Gray, filed this joint chapter 13 case in late July 2007. In late May 2005, Deana Gray had purchased the car from the Saturn dealer in Chattanooga. Mr. Gray did not sign any contract with or promissory note to the dealer or GMAC, and the certificate of title shows only Deana Gray as the owner. Subsequent references to "the debtor" mean Deana Gray only.

The sale contract was also a retail installment financing agreement. For the sake of simplicity, the court will refer to the contract as providing a loan to the debtor to buy the new car. The contract reserved a security interest in the car to secure payment of the debt. The dealer assigned the contract and the dealer's interest in the car to GMAC, which perfected the security interest by having it noted on the certificate of title.

GMAC's proof of claim states that the amount of the secured debt is $19,235.04. The debtors' chapter 13 plan provides that GMAC will be paid an allowed secured claim of $12,700 with 8% interest, and the payments will be $480 per month. The $6,535.04 balance of the debt would be paid under the plan as a non-priority unsecured claim. The plan provides that those claims will be paid in full without interest.

The plan's method of dealing with GMAC's secured claim is generally allowed by § 506(a) and § 1325(a)(5)(B) of the bankruptcy code whenever the secured debt is more than the value of the collateral. 11 U.S.C. §§ 506(a) & 1325(a)(5)(B) *but see* 11 U.S.C. § 1322(b)(2), (c) (home mortgage exception). GMAC contends that § 1325(a) does not allow its secured claim to be dealt with in this way. GMAC relies on the final paragraph of § 1325(a). Since the final paragraph is not numbered, it has become known as the hanging paragraph. It states:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [period] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor . . . .

11 U.S.C. § 1325(a)(final paragraph).

The drafters of the hanging paragraph assumed that the correct method to make § 1325(a)(5)(B) not apply to a secured claim was to make § 506 not apply to the claim. *See Citifinancial Auto v. Hernandez-Simpson*, 369 B.R. 36 (D. Kan. 2007); *General Motors Acceptance Corp. v. Peaslee*, 373 B.R. 252 (W. D. N. Y. 2007); *DaimlerChrysler Financial Services Americas v. Brown (In re Brown)*, 339 B.R. 818 (Bankr. S. D. Ga. 2006). The court is not concerned with that problem because the debtor does not dispute that the hanging paragraph was intended to prevent cram-down under § 1325(a)(5)(B).

The parties have stipulated that GMAC's claim meets the requirements of the hanging paragraph except one. The dispute is over the requirement that GMAC must have "a purchase money security interest securing the debt that is the subject of the claim." The courts have looked to state law to determine the meaning of "purchase money security interest." *In re Hayes*, 376 B.R. 655 (Bankr. M. D. Tenn. 2007). In this case, the relevant state law is § 9-103 of the Uniform Commercial Code (the UCC) as adopted in Tennessee. A security interest is a purchase money security interest if it secures a purchase money obligation. A purchase money obligation is (1) an obligation incurred as all or part of the price of the collateral, or (2) an obligation for value given to enable the obligor to acquire rights in or the use of the collateral, provided the value was used for that purpose. Tenn. Code Ann. § 47-9-103(a)(1), (a)(2) & (b)(1).

When the debtor bought the new car, she traded in her old car. The debtor's argument that GMAC's claim is not protected by the hanging paragraph relies entirely on the effect of the trade-in. The parties have not raised a dispute as to whether other charges included in the principal amount of the loan were not purchase money obligations and prevent GMAC's claim from being entirely a purchase money claim. *See In re Hayes*, 376 B.R. 655 (Bankr. M. D. Tenn. 2007).

The problem caused by the trade-in can be explained by referring to the figures used in the sale contract:

| | |
|---|---|
| Cash price | $25,972.00 |

    Total down payment
        Gross trade-in $10,100.50 – payoff by seller $14,362.48
        = net trade-in   $4,261.98– +        cash $ 1,000.00
        + other (describe) REBATES        $ 3,500.00    $   238.02

    Unpaid balance of cash price (1 minus 2)        $ 25,733.98

The trade-in was valued at $10,100.50 and secured a debt of $14,362.48. This means there was "negative equity" of $4,261.98 in the trade-in. Negative equity is an unsecured debt owed by the buyer that must be paid to complete the debtor's purchase of the new car. These facts lead to the following argument:

> (1) the financed debt included the $4,261.98 in negative equity;
>
> (2) the part of the loan that was used to pay the negative equity was not used to pay the purchase price of the new car;
>
> (3) the negative equity part of the loan also was not made to enable the debtor to acquire the new car;
>
> (4) as a result, the new car secures a debt that is partly for the negative equity, and to that extent the secured debt is not a purchase money obligation;
>
> (5) the hanging paragraph does not allow the court to divide the secured debt into the purchase money part and the non-purchase part, and therefore the court must treat the entire debt as a non-purchase money debt.[1]

    The court intentionally left out of this argument the preliminary question of whether any of the loan to the debtor was used to pay any of the negative equity. That is the question raised by the trade-in and the UCC's definition of purchase money obligation. If none of the loan was used to pay the negative equity, then the negative equity cannot make the secured debt entirely or partly a non-purchase money debt.

    The facts give GMAC two simple arguments for holding that the loan was not used to pay any of the negative equity. First, the debtor's transaction with GMAC had the same effect as if the debtor

---

[1] Judges Paine and Lundin have disagreed on whether the hanging paragraph allows the court to divide the debt into purchase money and non-purchase money parts when Tennessee law allows it. *In re Mitchell*, 379 B.R. 131 (Bankr. M. D. Tenn. 2007) (no) (Judge Paine); *In re Hayes*, 376 B.R. 655 (Bankr. M. D. Tenn. 2007) (yes) (Judge Lundin).

used the cash down payment and the rebates, instead of money borrowed from GMAC, to pay the negative equity directly to the creditor secured by the trade-in. A question can be raised as to why the debtor and the dealer did not follow that procedure. Convenience is the obvious explanation. The debtor desired to buy the new car by trading in the old car, and the dealer desired to sell the new car. The court doubts that either party considered paying the rebates and the cash down payment directly to the creditor secured by the trade-in for the purpose of proving that they were used to eliminate the negative equity. According to this argument, the debtor and the dealer adopted a simpler process. The debtor's money, instead of borrowed money, was passed from the debtor to the new car dealer to the creditor secured by the trade-in, and more importantly, the accounting in the debtor's contract with GMAC is consistent with that result.

The second argument focuses on the bottom line: since the cash down payment and the rebates exceeded the negative equity, then the borrowed money could not possibly have been used to pay any negative equity. The principal amount of the loan ended up including (1) only a part of the purchase price, and (2) the additional charges whose status as purchase money obligations has not been challenged. As a result, the loan was entirely a purchase money obligation under the UCC. Furthermore, the exact accounting used in the contract makes no difference to this outcome. In summary, the argument is that, no matter how the accounting was done in the contract, the principal amount of the loan can include only purchase money obligations.

Other bankruptcy courts have treated cash down payments or rebates as payments by the debtor that reduced the negative equity. *In re Petrocci*, 370 B.R. 489 (Bankr. N. D. N. Y. 2007); *In re Conyers*, 379 B.R. 576 (Bankr. M. D. N. C. 2007); *In re Burt*, 378 B.R. 352 (Bankr. D. Utah 2007). The debtor does have opposing arguments, however.

The *Pajot* and *Hayes* decisions take the position that the contract's method of accounting will determine whether the negative equity was reduced by a cash down payment or a rebate. *In re Pajot*, 371 B.R. 139 (Bankr. E. D. Va. 2007); *In re Hayes*, 376 B.R. 655, footnote 2 (Bankr. M. D. Tenn. 2007). The point seems to be that if the contract expressly applies a cash down payment or a rebate to the sale

price, then the secured creditor may be bound by the contract and cannot prove that the cash down payment or the rebate reduced the negative equity.

Staff interpretations of the Truth in Lending disclosure regulations treat this contract's method of calculating the net down payment as applying the cash down payment and the rebates to reduce the negative equity. 12 C.F.R. § 226.2, Supp. I, ¶ 2(a)(18)-3. The decision in *Pajot* may disagree with that interpretation. *Pajot*, 371 B.R. 139, 143-144, 155-156 (Bankr. E. D. Va. 2007). The contract in *Pajot* apparently used the same accounting method as the debtor's contract with GMAC. In the down payment section of the contract, it calculated the net value of the trade-in, which was negative, and on the next line, it credited the rebate. The court in *Pajot* seemed to reason that since the rebate was not used in calculating the net value of the trade-in, then it was not used to reduce the negative equity. The court supported this reasoning with the idea that rebates apply to the purchase price instead of the trade-in because rebates are given to encourage purchases. This court disagrees. The method of accounting used in the debtor's contract and apparently used in *Pajot* might be considered the best or even the required method of accounting to show that a rebate or cash down payment was applied to paying negative equity. The contract computed the negative equity and then applied the rebates and the cash down payment to reduce the negative equity.  Rebates are given to encourage purchases by reducing the total amount of money the buyer needs to acquire the new car or by providing the debtor a premium that can be used for some purpose other than acquiring the new car. A rebate can reduce the total amount of money the buyer needs by reducing the negative equity. The court concludes that the debtor's contract with GMAC applied the cash down payment and the rebates to the negative equity. *Compare In re Conyers*, 379 B.R. 576 (Bankr. M. D. N. C. 2007).

The debtor can attempt to avoid GMAC's arguments by arguing that the overall effect of the transaction was to finance payment of the negative equity. Of course, the negative equity increased the total amount of money the debtor needed to acquire the new car. An argument can be made that the negative equity also increased the loan by an equal amount. The question is not whether the negative equity increased the amount  of money the debtor needed to acquire the new car or even the amount of

the loan. The question under the UCC's definition of purchase money obligation is whether any of the loan was used to pay any of the negative equity. The court thinks not.

The court concludes that GMAC's argument is correct. The debtor's transaction with GMAC had the same effect as if the debtor paid cash, instead of money borrowed from GMAC, directly to the creditor secured by the trade-in. For convenience, the cash was passed through the new car dealer, but the effect was the same. The court has decided that the debtor's contract with GMAC applied the cash down payment and the rebates to eliminate the negative equity. As a result, the court need not adopt the broader argument that the contract's method of accounting should be irrelevant whenever the cash down payment and the rebates exceed the negative equity.

In summary, the secured obligation to GMAC does not include a debt for money lent to the debtor to pay the negative equity portion of the debt to the creditor secured by the trade-in. The debtor has not argued that GMAC's claim is non-purchase money or only partly purchase money because the loan was used to pay other charges that might not qualify as purchase money obligations. The court concludes that GMAC's claim secured by the 2005 Saturn car must be treated as a purchase money claim protected by the final paragraph of § 1325(a). The court will enter an order sustaining GMAC's objection to confirmation and allowing the debtor's time to file a modified plan. Of course, any modification is likely to reduce the amount to be paid under the plan on general unsecured claims so that they will receive less than 100%, which appears to be the result Congress intended.